**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

Charlotte McFerren, Billy Lee Green, Augustus Bostick Jr., Mark Adragna, and Courtney Koepf,

Plaintiffs,

v.

BAIC, Inc., VFG, Inc., (f/k/a Voyager Financial Group), SoBell Ridge Corp., Financial Products Distributors LLC, Performance Arbitrage Company, Life Funding Options, Inc., Andrew Gamber, Mark Corbett, Katharine Snyder, Michelle Plant, David Woodard, Candy Kern-Fuller, and Upstate Law Group,

Defendants.

Case No.

**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Plaintiffs Charlotte McFerren, Billy Lee Green, Augustus Bostick Jr., Mark Adragna and Courtney Koepf bring this action against Defendants BAIC, Inc., VFG, Inc., (f/k/a Voyager Financial Group), SoBell Ridge Corp., Financial Products Distributors LLC, Performance Arbitrage Company, Life Funding Options, Inc., Andrew Gamber, Mark Corbett, Katharine Snyder, Michelle Plant, David Woodard, Candy Kern-Fuller, and Upstate Law Group, and allege the following:

**I**

## PRELIMINARY STATEMENT

1. This lawsuit arises out of the concerted conduct of a group of individuals and their related companies who prey upon United States veterans to bilk them out of their federally-protected military pensions and benefits. The victims of this scam are often wounded or injured from their years of military service and are typically financially desperate at the time they are enticed by Defendants to borrow money as set forth below.

2. Federal law unequivocally declares that any agreements purchasing military pensions or benefits are "prohibited … and void from inception." *See* 38 U.S.C. § 5301(a) (veteran benefits); *see also* 37 U.S.C. § 701 (prohibition on assignment of military retirement pay). The core purpose of these laws is to protect veterans' economic interests, ensure that they always have available to them their federal income stream, and to protect them from predatory lenders or other unfair business practices.

3. Despite these prohibitions, the Defendants have devised, and are presently engaged in, a scheme that induces veterans to enter into costly, unconscionable agreements that directly violate these federal laws. The scheme includes contracts in which the veterans are charged undisclosed interest rates (far in excess of rates allowed by usury statutes) and in which the veterans sell their retirement or disability benefits for a period of months or years in exchange for a lump sum payment.

4. It is the purpose of this lawsuit to obtain damages for five such victims of this scam and to obtain declaratory and injunctive relief in the form of precedents that will assist not only them but other veterans who have been or may in the future be injured by this scheme.

5. Declaratory relief is critical to stopping this conduct. Efforts by state enforcement officials – including securities regulatory agencies in Texas, New Mexico, Pennsylvania,

California, and elsewhere – to stop this illegal activity have met with only partial success. The State of Arkansas, for example, obtained a consent order in 2014 permanently barring Defendants Andrew Gamber and Voyager Financial Group from continuing their illicit pension-related sales activities in that state. The agency, however, swiftly re-opened its investigations when it concluded that Mr. Gamber simply continued "to operate a similar enterprise under another company name."[1] Texas likewise shut down Mr. Gamber's operations in that state in 2016. In doing so, it noted Mr. Gamber's history of operating under multiple corporate guises. Attached hereto as Exhibit A are copies of cease and desist orders entered against one or more of the Defendants by the States of Arkansas, New Mexico, Pennsylvania, Texas, California, Iowa, Mississippi and Florida.

6. SoBell, Upstate Law Group, Performance Arbitrage Company, Financial Products Distributors and perhaps other Defendants are also under investigation by the Securities and Exchange Commission in connection with the pension scheme at issue in this lawsuit.[2] The SEC has expressed concern that Mr. Gamber, Financial Products Distributors, Performance Arbitrage Company and Upstate Law Group continued to evade the law by continually "shift[ing] their operations to other entities."[3]

---

1 *See Pension Advances: Legitimate Loans or Shady Schemes?*, Testimony of Kaycee L. Wolf, Staff Attorney for the Arkansas Securities Department, Before the United States Senate Special Committee on Aging (Sep. 30, 2015), p. 2 ("Wolf Testimony"), available at https://www.aging.senate.gov/imo/media/doc/Wolf_9_30_15.pdf (last accessed May 3, 2018).

2 *See* https://www.sec.gov/litigation/litreleases/2017/lr23763.htm (last accessed May 3, 2018).

3 *See Securities and Exchange Commission v. Upstate Law Group, Strategic Marketing Innovators, Inc., Performance Arbitrage Company, Inc., and Financial Products Distributors, LLC*, No. 4:17-mc-0009-A, United States District Court for the Northern District of Texas (Ft. Worth Division), Doc. 3, filed Feb. 27, 2017 at p. 5. This Court may also take judicial notice of this subpoena enforcement proceeding initiated by the Securities and Exchange Commission.

7. The impact of the Defendants' scam is significant: hundreds or thousands of former servicemen and women have fallen prey to this scheme. The Defendants' activity is widespread and nationwide. For example, state investigators in Arkansas concluded that between February 2011 and August 2012, Mr. Gamber and just one of his related entities (VFG) had illegally entered into contracts with veterans valued at more than $34 million.[4] Defendant Corbett has boasted elsewhere that "he gets 30 to 50 calls a day from people who want cash for their pensions."[5] There is every reason to believe the illicit conduct of the Defendants will continue unless this Court declares this scheme illegal.

## II. THE PARTIES

8. Plaintiff Charlotte McFerren is a resident and citizen of the State of Minnesota. Ms. McFerren is a veteran, having been honorably discharged from the Army. Ms. McFerren receives military disability benefits subject to 38 U.S.C. § 5301.

9. Plaintiff Billy Lee Green is a resident and citizen of the State of Mississippi. Mr. Green is a veteran, having been honorably discharged from the Navy. Mr. Green receives military retirement pay subject to 37 U.S.C. § 701(a).

10. Plaintiff Augustus Bostick Jr. is a resident and citizen of the State of Georgia. Mr. Bostick is a veteran, having been honorably discharged from the Army. Mr. Bostick receives military retirement pay subject to 37 U.S.C. § 701(c)-(d).

11. Plaintiff Mark Adragna is a resident and citizen of the State of Colorado. Mr. Adragna is a veteran, having been honorably discharged from the Army. Mr. Adragna receives military disability benefits subject to 38 U.S.C. § 5301.

---

4 Wolf Testimony at p. 5.

5 *See* http://www.aarp.org/money/credit-loans-debt/info-2014/beware-of-the-pension-predators.html (last accessed May 3, 2018).

12. Plaintiff Courtney Koepf is a resident and citizen of the State of West Virginia. Mr. Koepf is a veteran, having been honorably discharged from the Army. Mr. Koepf receives military disability benefits subject to 38 U.S.C. § 5301.

13. Defendant Andrew Gamber ("Mr. Gamber") is a resident and citizen of Arkansas and reportedly resides at 742 County Road 464, Jonesboro, Arkansas. He also reportedly has maintained an office at 1000 Highland Colony Park, Suite 5203, Ridgeland, MS 39157, *i.e.*, the same address as Defendant SoBell. That address is, in fact, actually a convenience address operated by Regus Offices. On information and belief, Mr. Gamber is an investor in or effectively controls Defendants Voyager, SoBell and BAIC, and is a director or officer of each.

14. Defendant BAIC, Inc.'s ("BAIC") address is not listed in any of the documents that were signed with BAIC by the Plaintiffs. Nor is BAIC's state of incorporation, email address or even a phone number provided in any of those documents. BAIC has stated in certain court filings and in email signature blocks that it is located at PO Box 2199, Gainesville, TX 76241-2199. The State of Mississippi, however, reports in its cease and desist order against Gamber and his affiliated companies that BAIC maintains its principal place of business at 211 E. 7th Street, Suite 620, Austin, Texas, 78701. *See* Exhibit A, p. 68. BAIC is a Texas corporation. Mr. Gamber is the president of BAIC.

15. Defendant VFG, LLC is a Delaware Limited Liability Company, with its principal place of business located at 801 Technology Drive, Suite F, Little Rock, Arkansas 72223. Mr. Gamber is believed to be the managing member of VFG, owning 100% of the company as of February, 2013. On information and belief, VFG was formerly known as Voyager Financial Group, LLC. VFG, LLC and Voyager Financial Group, LLC are collectively referred to as "Voyager" herein.

16. Defendant SoBell Corp. ("SoBell") is a Mississippi for-profit corporation, with its principal address being 1000 Highland Colony Park, Suite 5203, Ridgeland, Mississippi 39157. Mr. Gamber is the sole incorporator of SoBell.

17. Defendant Financial Products Distributors LLC ("Financial Products Distributors") is a business entity whose principal address is 811 Presa Arriba Road in Austin, Texas 78733.

18. Defendant David Woodard ("Mr. Woodard") is the founder and managing partner of Financial Products Distributors. Mr. Woodard is believed to be a resident and citizen of the State of Texas who resides at 811 Presa Arriba Road in Austin, Texas 78733.

19. Defendant Mark Corbett ("Mr. Corbett") is believed to be a resident of the State of California. He previously held himself out as operating a website (now closed) called www.buyyourpension.com. He has maintained multiple other websites, including http://www.vapensionloans.com, veteransbenefitsleverage.com, buyoutyourpension.com, and buyyourannuity.com. Mr. Corbett employs brand names or "doing business as" names including Bradling Financial Group ("Bradling") and Veterans Benefit Leverage ("VBL"). Mr. Corbett has held himself out as the Director of Marketing of Bradling. Mr. Corbett represents that Bradling is located at 232 Market Street, Flowood, Mississippi 39232. That address is a convenience address operated by Regus Offices. Among other websites, Mr. Corbett promotes Bradling on:

https://pensionloancompanies.com
www.VeteransBenefitLeverage.com
www.PensionAdvancer.com
www.LumpSum4Pensions.com
www.LumpSumForPensions.com
www.VBLfinancial.com

See Exhibit B (last accessed June 7, 2017). Mr. Corbett represents that VBL operates in "partnership with Bradling," and states that it is located at 33215 State Highway 79 South Temecula, CA." *See* Exhibit B, page 5. Mr. Corbett further describes VBL as "a referral agency operated by Bradling Financial Group LLC and provides information about services available to

veterans."[6]

20. Defendant Performance Arbitrage Company, Inc. ("Performance Arbitrage") represents that it is located at 232 Market Street, Flowood, Mississippi 39232, which is the same address allegedly occupied by Bradling. Among other websites, Performance Arbitrage has promoted itself on http://mypaconline.com. See Exhibit C (last accessed Nov. 27, 2017).

21. Defendant Katharine Snyder ("Ms. Snyder") is believed to a be a resident and citizen of the State of South Carolina. Ms. Snyder is a one-time director of Voyager and BAIC, former president of BAIC, and current president of Performance Arbitrage.

22. Defendant Michelle Plant ("Ms. Plant") is believed to be a resident and citizen of the State of Mississippi. Ms. Plant is a former director of compliance for Voyager, and current vice president and chief operating officer of Performance Arbitrage.

23. Defendant Life Funding Options, Inc. ("Life Funding") is a Delaware corporation whose address is 128 Millport Circle Suite 200 in Greenville, South Carolina 29607. That address is a convenience address operated by Regus Offices. Life Funding uses contracts identical to those of Defendant Performance Arbitrage. Life Funding's registered agent for service of process is Defendant Candy-Kern Fuller.

24. Defendant Candy Kern-Fuller ("Ms. Kern-Fuller") is a resident and citizen of the State of South Carolina. She is an attorney and a partner in Upstate Law Group, LLC.

25. Defendant Upstate Law Group, LLC ("Upstate") is a law firm located at 200 East Main Street, Easley, SC 29640. Upstate has maintained one or more IOLTA account(s) at institutions such as SunTrust Bank, N.A. and Community 1st Bank through which the payments to and from the Defendants flow in connection with the pension scam described below.

---

[6] *See* http://www.veteransbenefitleverage.com/contact-us.html (last accessed Jun. 20, 2017).

## III.
## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because this case presents federal questions arising under 38 U.S.C. § 5301(a) (prohibiting assignment of veteran benefits) and 37 U.S.C. § 701 (prohibiting assignment of military retirement pay), as well as the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

27. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events, acts and omissions giving rise to the claims addressed in this Complaint occurred in this District. Among other things, Defendant Kern-Fuller has maintained in this District the IOLTA bank accounts through which funds have been funneled to facilitate these illegal transactions, and Defendants Life Funding and Katharine Snyder are also located in this District. In addition, the agreements used by Defendants to effectuate their illegal schemes have specified that venue for any dispute raised by a veteran seeking to challenge the agreement shall be in Greenville County.

## IV.
## FACTS

28. The allegations in this Complaint are based on the personal knowledge of the Plaintiffs as well as the results of investigations into the misconduct of the Defendants by state and federal officials and other private litigants.

29. All Defendants have used instrumentalities of interstate commerce, including but not limited to the U.S. Postal Service, private delivery services, interstate wires, federally chartered national banking associations, federally insured banks and financial institutions, interstate highways, and common carriers to transmit information in furtherance of their scheme

as described below and to transfer the money scammed from veterans among themselves and to third parties in interstate commerce and across state lines. Without limitation, one such bank account used by the Defendants in interstate commerce is the IOLTA account (or accounts) maintained by Defendants Kern-Fuller and Upstate.

**A. Pension Advance Transactions**

30. Pensions, veterans' disability payments, and comparable forms of monthly income are perceived as highly dependable sources of funds. This stability makes them targets for certain unscrupulous operators. An exploitative marketplace has evolved in which pensioners sell the right to their future monthly payments, in exchange for an immediate lump sum. This type of arrangement is generally termed a pension advance transaction.

31. In June 2014, the United States Government Accountability Office ("GAO") issued a report about its investigation into thirty-eight pension advance companies. The GAO "identified questionable elements of pension advance transactions, including lack of disclosure of some rates or fees, and certain unfavorable terms."[7] The GAO notes that "most of [the] interest rates were significantly higher than the legal limits set by some states ... known as usury rates."[8] For these and other reasons, the GAO warned Congress and federal agencies that pension advance transactions pose risks to consumers, including veterans.

32. In September 2015, the United States Senate Special Committee on Aging solicited and heard testimony regarding pension advance transactions. Dr. Louis Kroot, who served as a physician in the United States Navy for 22 years, testified about his experience with a

---

7 *Pension Advance Transactions: Questionable Business Practices Identified*, United States Government Accountability Office (Jun. 2014), available at https://www.gao.gov/assets/670/663800.pdf (last accessed May 3, 2018) at p. 2 of the PDF (un-numbered introduction).

8 *Id*. at pp. 23-4 (internal numbering).

pension advance company.[9] After suffering a number of unexpected financial setbacks, he and his wife "jumped at" an offer of a pension advance. Dr. Kroot testified:

> We understood at the time that we were taking out an advance on monies that would be due from future retirement payments, and we understood that there would be fees for this service. But we didn't realize how expensive it was going to be. We simply did not get out the calculator and unpack the complex language in the agreements. We were desperate and we were panicked.[10]

33. After entering into the contract, the Kroots had time to reflect on the transaction, and were "shocked" to realize that they "were paying over 30 percent interest," a number not disclosed and arguably obfuscated by the contracts.[11] This interest rate was actually higher than what they would have paid if they had kept their existing debts (such as credit cards), rather than paying off those debts by obtaining the pension advance.[12]

34. In the same session, the Senate also heard testimony from Stuart Rossman, Director of Litigation for the National Consumer Law Center ("NCLC"). Mr. Rossman described how an NCLC report on veteran-related scams revealed that "the Judge Advocate General Corps felt that some of the greatest abuses they were seeing concerned the solicitation of retired military personnel to gain access to their pension payments."[13] NCLC looked into the

---

9 *See Pension Advances: Legitimate Loans or Shady Schemes?*, Testimony of Dr. Louis Kroot, CMDR, USN, Retired and wife Kathie Kroot, Before the United States Senate Special Committee on Aging (Sep. 30, 2015), available at https://www.aging.senate.gov/imo/media/doc/Kroots_9_30_15.pdf (last accessed May 3, 2018).

10 *Id*. at p. 2.

11 *Id*. at p. 3.

12 *Id.*

13 *See Pension Advances: Legitimate Loans or Shady Schemes?*, Testimony of Stuart Rossman, Before the United States Senate Special Committee on Aging (Sep. 30, 2015), available at https://www.aging.senate.gov/imo/media/doc/Rossman_9_30_15.pdf (last accessed May 3, 2018) at p. 3.

issue, and found that the cost of pension advances "can be astronomically high … with effective APRs of 27% all the way up to 106%."[14] Mr. Rossman further noted that "[t]he companies that target veterans for these illegal transactions are elusive; they change names and websites frequently and use nested structures to hide the identities of the individuals involved."[15] Mr. Rossman concluded by asserting that law enforcement action is necessary to stop these scams for good.[16]

**B. <u>The Operation of the Federal Anti-Assignment Acts</u>**

35. Almost since the inception of the United States, the nation has provided some form of disability payment in order to assist those persons who have been disabled in the line of military duty so they may live a whole and productive life. Likewise, the country has long provided pensions to persons who serve the requisite term of military duty. For over 100 years, federal law has prohibited any attachment, levy, seizure or assignment of those benefits and pensions.

36. The current iteration of federal law as reflected in 38 U.S.C. § 5301(a) renders void any purported sale or assignment of military disability benefits for consideration. It states:

> **(1) Payments of benefits due or to become due under any law administered by the Secretary shall not be assignable except to the extent specifically authorized by law**, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary. […]
>
> **(3)**
> **(A)** This paragraph is intended to clarify that, in *any* case where a beneficiary entitled to compensation, pension, or dependency and indemnity compensation

14 *Id.* at p. 4.

15 *Id.* at p. 9.

16 *Id.* at pp. 8-9.

> enters into an agreement with another person under which agreement such other person acquires for consideration the right to receive such benefit by payment of such compensation, pension, or dependency and indemnity compensation, as the case may be, except as provided in subparagraph (B), and including deposit into a joint account from which such other person may make withdrawals, or otherwise, *such agreement shall be deemed to be an assignment and is prohibited.* […]
>
> **(C)** Any agreement or arrangement for collateral for security for an agreement that is prohibited under subparagraph (A) is also prohibited and is void from its inception.

(Italics added.) Plaintiffs McFerren, Bostick, Adragna, and Koepf receive disability benefits subject to this provision.

37. To similar effect, 37 U.S.C. § 701(a) states that "a commissioned officer of the Army, Navy, Air Force, or Marine Corps may transfer or assign his pay account, *when due and payable*" (emphasis added). The Fourth Circuit Court of Appeals has held that this use of the phrase "when due and payable" means that a series of retirement payments cannot be sold or assigned in advance, as alleged herein. *See In re Moorhous*, 108 F.3d 51, 54–56 (4th Cir. 1997). Plaintiff Green receives retirement pay subject to this provision.

38. Finally, 37 U.S.C. § 701(c) states that "[a]n enlisted member of the Army, Navy, Air Force, or Marine Corps may not assign his pay, and if he does so, the assignment is void." The section further provides that no retired veteran may "allot" more than six payments to any third person unless (a) the relevant allotment began before retirement and (b) the relevant branch of the service was appropriately advised in advance. 37 U.S.C. § 701(d). Plaintiff Bostick receives retirement pay subject to these provisions.

39. For purposes of this Complaint, 38 U.S.C. § 5301(a) and 37 U.S.C. § 701 are collectively referred to as the Federal Anti-Assignment Acts.

**C. <u>The Defendants' Scheme in Violation of the Federal Anti-Assignment Acts</u>**

40. The Defendants operate a coordinated scheme that may be outlined as follows:

41. *First*, websites such as baiconline.com, bradling.com, PensionAdvancer.com, pensionloancompanies.com, LumpSum4Pensions.com, and VeteransBenefitLeverage.com generate leads.

42. *Second*, brokers and salespeople – such as Mark Corbett – follow up with the veteran leads, sending forms for the veteran to fill out. These forms are substantially identical, whether the veteran is told that he or she is working with BAIC, Voyager, SoBell or Mr. Corbett individually. The forms require the veteran to make extensive personal disclosures. The forms refer to Upstate Law Group as part of the "transaction team." Defendants Kern-Fuller and Upstate make inquiries about the veteran's financial circumstances, benefits, and physical health after receiving the appropriate authorizations. All or nearly all of the Defendants correspond with veterans and facilitate the execution of various documents.

43. *Third*, the veteran must disclose his or her pre-existing debts, and the Defendants, including Defendants Performance Arbitrage, Snyder, Corbett, Kern-Fuller and Upstate, compile a list of creditors. The Defendants require the veteran to pay off those debts with his or her lump sum payment, and Defendants Performance Arbitrage, Snyder, Corbett, Kern-Fuller and Upstate facilitate the payments to those creditors.

44. *Fourth* the veteran either obtains a life insurance policy, or executes an "Option to Purchase Source Defaulted Structured Asset Agreement" ("Option Agreement") with Defendant Performance Arbitrage, which is operated by Defendants Snyder and Plant. The life insurance policy, if any, will pay off the veteran's loan contract in the event of the veteran's death. The Option Agreement also pays off the veteran's loan contract in the event of the veteran's death.

45. *Fifth*, the veteran is told by Mr. Corbett, BAIC, Voyager or SoBell that a Purchaser has been found to buy his or her VA benefits. The veteran and the Purchaser execute a contract for sale of payments and security agreement, using form contracts supplied by the Defendants.

46. *Sixth*, the Purchaser wires a lump sum to Defendants Kern-Fuller and Upstate. Defendants Kern-Fuller and Upstate then deduct 40-50% of the lump sum as a "commission." On information and belief, Defendants Kern-Fuller and Upstate distribute that "commission" among the Defendants. Defendants Kern-Fuller and Upstate then pay the veteran's existing creditors, deduct other fees and costs, and remit the remainder to the veteran via wire transfer.

47. After all of the deductions, a veteran may receive only a few thousand dollars in his or her pocket with which to achieve their original goal of financial stability.

48. *Seventh*, if the veteran stops making payments under his or her contract, Defendants Performance Arbitrage, Life Funding, Financial Products Distributors, Kern-Fuller and/or Upstate send collection notices to the veteran.

49. *Eighth*, if the Purchaser has executed a default buyback agreement with Defendant Performance Arbitrage, then Performance Arbitrage or its successor in interest, i.e., Life Funding (whose agent for service is Ms. Kern-Fuller), may sue the veteran.

## D. <u>The Respective Roles of the Defendants</u>

### ***Andrew Gamber***

50. The Department of Securities Sales of the State of Arkansas and the Texas State Securities Board have concluded that Mr. Gamber directs the operation of at least BAIC, Voyager, and SoBell.[17] Indeed, on information and belief, Mr. Gamber is the mastermind behind

---

17 *See*, e.g., Exhibit A, pp. 10-11 and 61.

the activities outlined in this Complaint. On information and belief, Mr. Gamber has a long history of legal and regulatory misconduct, including:

a. On April 14, 2008, Mr. Gamber and the Arkansas Insurance Commission entered into a consent order placing his insurance license on probationary status following multiple complaints about Gamber's false and misleading conduct in connection with his activities as an insurance salesperson, including alleged forged signatures on paperwork.

b. The Arkansas Insurance Commissioner filed a Cease and Desist Order directing Mr. Gamber to cease all insurance-related activities in the state because of, among other things, repeated misrepresentations to insureds and alleged financial improprieties. Mr. Gamber entered into a Consent Order on or about July 1, 2009 surrendering his insurance license and agreeing to pay a penalty in the amount of $25,000.

c. At least eight different states have entered orders barring Mr. Gamber and his companies from the illegal sale of securities associated with the pension purchase scheme described herein. Such orders were entered by the following states on the following dates: Arkansas (April 22, 2013, March 18, 2014 and June 23, 2014); Iowa (September 20, 2013); New Mexico (December 10, 2013); Pennsylvania (May 12, 2014); Florida (August 24, 2014); California (November 7, 2014); Texas (February 1, 2016); Mississippi (February 23, 2017). *See* Exhibit A.

51. Mr. Gamber and his co-conspirators conspicuously fail to disclose any of the facts recited in Paragraph 50 to the veterans whom they solicit in connection with the pension

purchase scheme.

***BAIC, Voyager, SoBell***

52. Defendants BAIC, Voyager and SoBell each appear to have identical business models and to use identical forms and contracts.

53. Attached as Exhibit D is a true and correct copy of the so-called New Seller Information Packet used by BAIC. On information and belief, that Seller's Kit, in substantially similar form, has been used consistently by other Defendants (including Voyager, SoBell and Mark Corbett). On information and belief, Mr. Gamber personally directs and controls the operations of BAIC and directed and approved, for example, both (i) the creation and distribution of the New Seller Information Kit and (ii) the transactions that are the subject of this lawsuit.

54. In addition to filling out the New Seller Information Packet, each veteran also executed Sales Assistance Agreements with one or more of the Defendants. *See* Exhibit E. In the Sales Assistance Agreement, BAIC (or Voyager, SoBell or Mr. Corbett) commits that it will "assist" the veteran in finding a third-party Purchaser who will "buy" a stream of the veteran's benefits. *Id*. In part, it states:

> Seller appoints [Voyager/BAIC/SoBell/Mark Corbett] as Seller's agent for the express, limited, purpose of submitting a contingent offer for sale of the Payments ("Offer of Sale"), on Seller's behalf and under specified terms approved by the Seller, to one or more third party potential buyer(s), the identities of which are to be provided to [Voyager/BAIC/SoBell/Mark Corbett] by independent contractor(s); provided, however, that [Voyager/BAIC/SoBell/Mark Corbett] shall not provide Seller with any form of legal or financial advice at any time, and further provided that such agency relationship shall immediately terminate upon the closing of a sale of the payments, unless otherwise terminated as provided for herein.

55. At a now-defunct website (www.lumpsumsettlementstore.com), Voyager made the following representations that explained how it (and its co-conspirator Defendants) have

operated:

> The Lump Sum Settlement Store is part of the Voyager Financial Group family.
>
> Through our money purchase pension plan, Lump Sum Settlement Store transacts a pension buyout and advances you the cash when needed.
>
> Nowhere else can you leverage your military, civil service or corporate pension by exchanging a future trickle of income for cold, hard cash in your hands today.
>
> The process is simple, easy and transparent. … To let us know a little more about your pension, your needs, and your wants, we will contact you to discuss what we can do for you, and we will work with you to arrive in a quote that meets your needs. After that, we'll send you the paperwork and ask you to return it so that we may begin working on your behalf!
>
> We will then work to find a buyer for your income stream. Once we find a buyer, they will wire their money for the purchase to our escrow company. The escrow company will then send your money to you. The whole process can take as little as three to six weeks, from your returned paperwork to cash in your hands.
>
> During the pension period, you'll be required to carry a life insurance policy as collateral. If you don't yet have life insurance, we have licensed independent agents ready to assist you in securing coverage.
>
> So, how much will you be paid for your pension? The short answer is "it depends." Each time the Lump Sum Settlement Store staff evaluates a pension, we use a purely mathematical formula to help us define the present value of your future dollars.
>
> We purchase Civil Service, Corporate, and Military Pensions.

56. After the veteran signs the Sales Assistance Agreement, BAIC (or Voyager, SoBell or Mr. Corbett) searches for persons who would be willing to buy the stream of the veteran's pension income. These persons are hereafter called the "Purchasers."

57. After finding a Purchaser, BAIC (or Voyager, SoBell or Mr. Corbett) instructs the veteran to enter into an agreement with the Purchaser.

***Mark Corbett***

58. Mr. Corbett operates under the brand names or "doing business as" names of

Bradling Financial Group and Veterans Benefit Leverage. Mr. Corbett has brokered or otherwise been involved in transactions consummated through Voyager, BAIC, and SoBell.

59. In an apparent effort to conceal his identity, Mr. Corbett has used a photograph on one or more of his websites; in fact, that photograph was lifted from an online article in Forbes Magazine:[18]




60. Mr. Corbett maintains a number of websites that generate leads on veterans who may need money. For example, Mr. Green filled out a contact form on buyyourpension.com, which was forwarded to Mr. Corbett at bradling.com, and in response to which Mr. Corbett sent Mr. Green a set of BAIC paperwork.

61. In furtherance of the Defendants' common enterprise, Corbett interviews

---

18 *Compare* https://vapensionloans.com/index.php/va-pension-advances *and* https://www.forbes.com/sites/jacquelynsmith/2013/03/11/10-nonverbal-cues-that-convey-confidence-at-work/#79de7b7a5e13 (both last accessed May 3, 2018).

interested veterans in order to qualify them for purposes of buying some or all of the veteran's benefits. Mr. Corbett also provides veterans with information about the transaction, sends them forms and disclosures, solicits information from veterans, monitors the progress of each veteran's transaction, and is copied on most email correspondence with the veteran.

***Financial Products Distributors & David Woodard***

62. According to a Financial Products Distributors publication, it "serves as a Distributor for various factoring companies that specialize in facilitating the purchase of Payments derived from certain Structured Assets," including military retirement and disability benefits. *See* Exhibit F. "These factoring companies identify those individuals interested in selling a portion of their payments through websites such as www.buyyourpension.com, www.cashnowforyourpension.com and www.bradling.com." *Id*. As mentioned above, www.buyyourpension.com and www.bradling.com are both maintained by Mark Corbett. Financial Products Distributors also states that:

> To further protect Buyers, we engage independent counsel through Upstate Law Group, LLC ("ULG") to review and verify all of the supporting documentation in the Closing Book ... Additionally, the utilization of ULG for closing the transactions and servicing the ongoing payments ensures a Buyer's funds are always in the hands of an insured escrow agent.

*Id.*

63. Financial Products Distributors is under investigation by the Securities Exchange Commission, along with Defendants SoBell, Upstate, and Performance Arbitrage.

64. Financial Products Distributors is enmeshed with the origination and collection processes of the other Defendants. For example, a form used by Mr. Corbett in Ms. McFerren's transaction permitted Mr. Corbett to share information about Ms. McFerren with Financial Products Distributors. In a single email chain regarding changes to Upstate's bank accounts, a person named Beverly Murphy sent emails to Mr. Green (concerning his BAIC and SoBell

loans) with both the following signature blocks:

| Beverly Murphy<br>Submissions Administrator<br>Performance Arbitrage Company<br>Mobile (512)783-6477 | Beverly Murphy<br>Sales Support<br>Financial Product Distributors<br>Mobile (512)783-6477 |
|---|---|

65. David Woodard is the Founder & Managing Partner of Financial Products Distributors. Mr. Woodard corresponded with Ms. McFerren, and instructed her on steps she needed to take to complete the transaction.

***Candy Kern-Fuller & Upstate Law Group***

66. With vast streams of cash flowing in from military pensioners and the Purchasers, the Defendants needed a bank account to accept the ongoing deposits and make distributions to the Purchasers and the other Defendants. The Defendants have utilized an IOLTA account maintained by Ms. Kern-Fuller and Upstate as the conduit through which the Purchasers' deposits and the veterans' deposits flow.

67. Prior to May 2017, prior to closing a pension transaction with the Defendants, veterans had to prove that they had instructed the Veterans Administration to deposit the veteran's entire monthly benefit directly into Upstate's IOLTA account, or made an "allotment" to that account. The VA would likely refuse those instructions, so the Defendants told veterans to make the change online rather than over the phone, and to (unknowingly) misrepresent to the VA that the IOLTA account is a "checking" account, since the VA will only allow deposits into checking or savings accounts. *See* Exhibit G.

68. In approximately May 2017, Upstate instituted a new system whereby funds are instead withdrawn from some veterans' bank accounts. Defendants purport to create a collateral interest in such accounts. *See, e.g.*, Exhibit K ("The collateral is the right to receive the income

stream in the amount of $ ______ associated with Account/Annuity # xxx-xx- ______ with _______; [sic] payable monthly as an account receivable.")

69. Purchasers wire their investment funds – usually $40,000-$50,000 – to Upstate's IOLTA account.

70. Ms. Kern-Fuller and Upstate deduct approximately 40-50% from the Purchaser's investment funds for the Defendants' ostensible commission. On information and belief, Ms. Kern-Fuller and Upstate use wire transfers or the United States mail to distribute this undisclosed commission among the Defendants.

71. Ms. Kern-Fuller and Upstate then deduct substantial fees from the remainder, before wiring the balance to the veteran and/or the veteran's pre-existing creditors.

72. Ms. Kern-Fuller and Upstate Law Group transmit the veteran's monthly loan payments to the Purchasers by wire transfer, and remit any remainder of the veteran's VA benefit to the veteran, also by wire transfer.

73. Among other things, the use of the IOLTA account maintained by the law firm (a) fosters a deceptive illusion of legality; (b) bypasses scrutiny by the Department of Veteran Affairs as to whether the funds are being deposited into a permissible kind of account; and (c) permits the Defendants to monitor whether the veterans are making the requisite payments.

74. In addition to making the Upstate IOLTA account available as the bank account for this pension scheme, Ms. Kern-Fuller and Upstate (a) purport to assist veterans in obtaining identity and financial verification documents, (b) review pre-approval documents, (c) gather information about the veteran's pre-existing creditors and make payments to those creditors, (d) facilitate the execution of the contracts, (e) sue allegedly defaulting veterans in an effort to enforce the agreements, and (f) oppose attempts to discharge such debt through bankruptcy.

Voyager has offered the services of Upstate in at least one instance to assist a Purchaser in pursuing claims against a veteran. *See* Exhibit A, p. 5.

***Performance Arbitrage Company***

75. Performance Arbitrage participates in the origination process, insures these transactions (through Option Agreements and default buyback agreements), participates in loan servicing activities, acts as a debt collector, and sues veterans.

76. Performance Arbitrage's president (Katharine Snyder) and vice president/chief operating officer (Michelle Plant) are former officers of BAIC and Voyager.

77. Performance Arbitrage corresponds with veterans about the forms that veterans must fill out. Ms. McFerren was required to sign a Fair Credit Reporting Act release that authorized Performance Arbitrage and Upstate to investigate her credit history, check her references, conduct a criminal background check, and share information with prospective Purchasers.

78. According to a Financial Products Distributors publication, Performance Arbitrage performs:

> [i]n-depth telephone interviews and document review to ensure [veterans] meet established requirements relating to residence and employment stability, household income and expense ratios post-sale, reason for entering into transaction, and other criteria established to ensure only those [veterans] most able to maintain their financial commitment … are approved.

*See* Exhibit F.

79. In many instances, Performance Arbitrage guarantees the transaction by entering into a default buyback agreement with the Purchaser. If a veteran stops making payments, Performance Arbitrage is obligated to issue a promissory note to the Purchaser, and to make payments in place of the veteran. Once Performance Arbitrage has purchased a

veteran's contract in this manner, Performance Arbitrage may sue the veteran.

80. In other cases, the *veteran* pays Performance Arbitrage a fee to enter into an "Option to Purchase Source Defaulted Structured Asset Agreement." *See* Exhibit H. The Defendants require veterans *either* to purchase life insurance (from an outside vendor), or to enter into one of these Option Agreements.

81. From 2012 to 2014, veterans working with BAIC and Voyager were generally required to take out life insurance policies, and the BAIC and Voyager forms reflect that requirement. Performance Arbitrage was incorporated in 2014. SoBell subsequently required either "life insurance or [its] equivalent," and instructed veterans to "contact [their] vendor," *e.g.*, Mark Corbett, for "other options" if they had difficulty obtaining life insurance. For example, in February 2015, Mark Corbett instructed Mr. Green to call him "to discuss *our* INSURANCE ALTERNAIVE [sic] PRODUCT" if Mr. Green was uninsurable or if he received a life insurance quote of more than $40.00 per month. (Italics added.) In August 2016, Mr. Corbett wrote to Mr. Bostick that "*[o]ur* company now offers 'THE PAC OPTION' it will allow you to sell your payment without obtaining 'LIFE INSURANCE'." (Italics added.)

82. Not only do the Option Agreements take the place of life insurance, they function as life insurance. The language of the Option Agreement provides for a payout to the Purchaser in the event that the veteran defaults "due to the [veteran] permanently no longer being qualified to receive the payment(s) [from the VA]." Given that the payments in question are pensions and permanent disability benefits, the only statistically significant scenario in which Performance Arbitrage will have to pay out under an Option Agreement is if the veteran dies.

83. Ms. McFerren, who is 35 years old, paid $600 for this protection on a transaction involving approximately $23,500. Mr. Bostick, who is 45 years old, paid $1,200 for this protection on a transaction involving approximately $25,200. Mr. Green, who is 60 years old, paid $1,400 for this protection on a transaction involving approximately $13,000.

84. In each case, the payment was made as part of the overall transaction. That is, Performance Arbitrage's fee was deducted from the amount the Plaintiffs received from Ms. Kern-Fuller and Upstate.

85. On information and belief, Performance Arbitrage is not licensed to issue life insurance policies.

86. It is unclear what consideration the Plaintiffs received in exchange for their payments to Performance Arbitrage. The veterans are purportedly only "selling" their right to receive payments. If that right no longer exists, the Purchaser has no recourse to the veteran's other assets, as one might on a loan. There is no ground for personal liability on this debt, against either the veteran or his or her estate. The only consideration received by the Plaintiffs is, in effect, an unregulated life insurance policy.

***Katharine Snyder & Michelle Plant***

87. Ms. Snyder has acted at various times as Director of Voyager, Director of BAIC, and President of BAIC. Ms. Snyder is currently President of Performance Arbitrage. On information and belief, Ms. Snyder also serves or has served as an officer of various other entities that share officers, addresses or business models with the Defendants herein, including Strategic Marketing Innovators, which is also under investigation by the Securities Exchange Commission.[19]

[19] *See Securities and Exchange Commission v. Upstate Law Group, Strategic Marketing*

88. Ms. Snyder executes assignments of veterans' contracts from Performance Arbitrage to Life Funding, with Candy Kern-Fuller notarizing those assignments.

89. Ms. Plant was formerly the Director of Compliance of Voyager and is currently the Vice President and Chief Operating Officer of Performance Arbitrage.

90. On information and belief, Ms. Snyder and Ms. Plant are now directing the operation of Defendant Life Funding.

***Life Funding Options***

91. As described above, some Purchasers enter into a default buyback agreement with Defendant Performance Arbitrage. If the veteran stops making payments, the Purchaser may invoke the default buyback agreement, which requires Performance Arbitrage to issue a promissory note to the Purchaser. *See* Exhibit A, p. 62.

92. In exchange for this promissory note, Performance Arbitrage receives an assignment of the Purchaser's rights under the contract for sale of payments and security agreement that the Purchaser and the veteran had signed. *See* Exhibit I. Until 2016, when Performance Arbitrage sued a veteran, it typically attached that assignment document to demonstrate its standing to sue the veteran.

93. Defendant Life Funding was incorporated in November 2016, and maintains an address in Greenville, South Carolina at a convenience office. Its agent for service of process is Defendant Candy Kern-Fuller.

94. The concerted activity of the defendants is further evidenced by (among other things) their use of common documentation. To take but one example, the same forms of

---

*Innovators, Inc., Performance Arbitrage Company, Inc., and Financial Products Distributors, LLC*, No. 4:17-mc-0009-A, United States District Court for the Northern District of Texas (Ft. Worth Division).

assignment are used by both Performance Arbitrage and Life Funding. *See* Exhibits I-J. Likewise, it would appear that the defendants operate as an enterprise when it comes to enforcement and collections. For example, Mr. Adragna signed a contract for sale of his veteran payments in December 2014 and stopped making such payments in approximately February, 2015. Yet, Mr. Adragna is now being sued in a separate state court lawsuit by *Life Funding*, which (a) had *no* role in the underlying transaction and (b) did not even come into existence until 18 months after Mr. Adragna allegedly went into default. The curious interposition of Life Funding as the enforcer for a deal in which it otherwise had no financial interest is consistent with the existence of a joint enterprise devoted to the same unlawful purpose, namely, the collection of monies in violation of the Federal Anti-Assignment laws

**E. Additional Overreaching and Unconscionable Aspects of the Agreements**

95. The Defendants have conspired with, and acted in concert with each other, to identify and solicit pension sales from veterans that they knew or should have known are prohibited and void under the Federal Anti-Assignment Acts.

96. None of the documents or other disclosures made by the Defendants discloses that these transactions are prohibited and void under the Federal Anti-Assignment Acts, nor do they reveal the multiple lawsuits and regulatory actions taken against the Defendants. To the contrary, in the rare instances when a veteran inquires about this issue, the Defendants – including Ms. Kern-Fuller – represent that they have structured the transactions in such a fashion that the practice of buying a portion of the veterans' pension is legal.

97. The Defendants involved in these schemes extract substantial "commissions" – approximately 40% of the sum deposited by the Purchasers – in connection with these transactions without disclosing this fact to either the Purchaser buying the military pension or

benefits, or the veteran selling his or her military pension or benefit.

98. No matter how the Defendants may choose to style the transactions at issue, the effect is the same: they are sales or assignments of a military pension or benefit of the kind prohibited by the Federal Anti-Assignment Acts. As such, the agreements with the veterans are void and unenforceable from inception under the Federal Anti-Assignment Acts.

99. In addition to violating the Federal Anti-Assignment Acts, the Defendants use unconscionable agreements in an effort to deny veterans their legal rights. Because these agreements are void from inception, none of those objectionable features are legally enforceable. Even independently of the application of federal law, the agreements are still unconscionable and unenforceable insofar as they:

a. Fail to disclose the applicable interest rate or finance charge associated with the so-called "sale." For example, the undisclosed interest rates on BAIC transactions in July 2013 are believed to have ranged between 25% and 47.18%.

b. Purport to strip any ruling by this or any other court regarding the illegality of these contracts of having any precedential effect. Exhibit K, for example, is a form agreement used by the Defendants in connection with the sale of a veteran's pension to a Purchaser. Section 19 declares, "[N]o verdict will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to this contract."

c. Purport to impose a penalty – *in addition to other damages* – on any veteran who ultimately declines to continue to send his or her pension and benefits to the Upstate Law Group IOLTA account, in an amount equal to "DOUBLE

THE INCOME STREAM PAYMENT FOR EACH INCOME STREAM PAYMENT THAT SELLER MISDIRECTS OR PREVENTS BUYER FROM RECEIVING." Exhibit K, Section 12 (capitalized in original).

d. Release the so-called "Transaction Team" (*i.e.*, BAIC, Corbett and Upstate Law Group and others, depending on the corporate identities then being used) from any and all liability in consideration of their ostensibly "valuable services" in bringing the veterans and Purchasers together. *See* Exhibit K, ¶¶ 11, 20. The unconscionable intent of this clause is to require that financially desperate veterans release the Defendants for their complicity in conduct that has been found to be illegal by at least eight states.

e. In or about May 2017, at the same time that they changed bank accounts, Ms. Kern-Fuller and Upstate Law Group presented veterans with the option to sign an ACH Authorization Agreement in lieu of using the Upstate Law Group account. See Exhibit L. Under this agreement, the veteran would have the VA deposit his or her monthly benefit directly into the veteran's own bank account, and Upstate Law Group would be authorized to make withdrawals in any amount it chose from the account. More specifically, the ACH Authorization Agreement (a) purports to authorize any debit by Upstate Law Group, including the debit of the full remaining balance due under the contract – plus liquidated damages equal to the amount of that balance – in the event of default; and (b) states that such recourse "is a fundamental condition and additional consideration to induce [the Purchaser] to enter into the Contract" with the veteran, despite the fact that the contract has already

been formed, and thus no inducement is necessary or possible.

100. All of the contractual provisions set forth in Paragraph 99 of this Complaint are void from inception.

## V.
## THE OPERATION OF DEFENDANTS' SCHEME AS APPLIED TO THE PLAINTIFFS

### A. After an Honorable Discharge, Ms. McFerren's Disability Has Made It Difficult for Her to Work.

101. Ms. McFerren is an honorably discharged member of the Army. She enlisted in 2007, and was injured during her training shortly thereafter. Due to injuries to her lower back, Ms. McFerren experiences constant pain, and cannot sit for any length of time. She was honorably discharged in August 2008.

102. In 2017, Ms. McFerren and her husband wanted to buy a home to provide stability for their three young children. With the purpose of obtaining money for a down-payment, or improving their credit sufficiently to get an affordable loan, Ms. McFerren reached out through a website contact form, and was put in touch with Mr. Corbett. The McFerrens did not receive enough money for a down payment, and Ms. McFerren's credit score has not improved.

103. Ms. McFerren's transaction took place quickly, with all the forms and contracts signed between August 11, 2017 and August 18, 2017. When Ms. McFerren asked Mr. Corbett for details about how the transaction would work, he threatened not to go through with the transaction unless she stopped asking questions.

104. The effective rate of interest paid by Ms. McFerren is 23.93%. Up to half of the money paid by the Purchaser of Ms. McFerren's benefits never reached Ms. McFerren, but instead was appropriated by the Defendants herein. Those facts were never disclosed to Ms.

McFerren.

105. At no time did Mark Corbett, Performance Arbitrage, Upstate, David Woodard (or any other Defendant) tell Ms. McFerren that the transaction into which she was entering was prohibited and void under the Federal Anti-Assignment Acts.

106. After learning of the Federal Anti-Assignment Acts, in fear that the agreement between her, Mark Corbett, and the Purchaser would place her veteran benefits at risk, and in order to pay her family's heating bills, Ms. McFerren ceased making payments in or about October 2017.

**B. After Retiring from the Navy, Mr. Green Needed to Support His Family Despite Unemployment.**

107. Mr. Green enlisted in the Navy in 1976. After 14 years of service, he enrolled in an officer training course, and was a Warrant Officer at the time of his retirement in 1999.

108. In the years following his retirement, Mr. Green had difficulty finding steady employment that would allow him to be near his family. After working away from his family, then working at Walmart for $6.00 an hour, and then declaring bankruptcy, Mr. Green looked for another way to finance his son's college education, and found BAIC.

109. Mr. Green took out two loans from BAIC, and a third from SoBell, in 2013, 2014 and 2015 respectively. He has repaid substantially more than he received on the first two loans, and has repaid approximately the same amount he received on the third one.

110. At no time did BAIC, SoBell, or any other defendant tell Mr. Green that the transactions into which he was entering were prohibited and void under the Federal Anti-Assignment Acts.

111. The effective rate of interest on Mr. Green's second loan is 25.29%. On information and belief, each of the effective rates of interest paid by Mr. Green exceeded legal

limits, and up to half of the money paid by the Purchaser of Mr. Green's pension never reached Mr. Green, but instead was appropriated by the Defendants herein. Those facts were never disclosed to Mr. Green.

112. In or about October 2017, after becoming suspicious of BAIC, SoBell and Upstate because of their unusual and unprofessional debt collection practices, Mr. Green discovered that this type of transaction is illegal, and discontinued making payments to Upstate.

### C. After Retiring from the Army, Mr. Bostick Was Unable to Work Due to Post-Traumatic Stress.

113. After serving in the Army for 20 years, Mr. Bostick retired in 2013 as a Sergeant First Class. Mr. Bostick served in Iraq, Kosovo, Germany, and in a 9/11 unit in the United States.

114. Mr. Bostick had planned to work in law enforcement after his retirement from the Army, and did so for three years. However, post-traumatic stress from his time in the military forced him to retire from law enforcement in late 2016. Mr. Bostick immediately began looking for a way to support his children, and found Mark Corbett.

115. Mr. Corbett forced Mr. Bostick to pay off his pre-existing debts with his lump-sum payment, such that Mr. Bostick received approximately $9,000. In return, he was expected to repay $53,400.

116. At no time did Mr. Corbett or any other defendant tell Mr. Bostick that the transactions into which he was entering were prohibited and void under the Federal Anti-Assignment Acts.

117. On information and belief, the effective rate of interest paid by Mr. Bostick exceeded legal limits, and up to half of the money paid by the Purchaser of Mr. Bostick's pension never reached Mr. Bostick, but instead was appropriated by the Defendants herein. Those facts were never disclosed to Mr. Bostick.

118. In or about June 2017, after making approximately seven payments, Mr. Bostick realized that he was supposed to repay double the amount of his contract. After doing some searches on the internet, Mr. Bostick realized that this type of transaction is illegal, and stopped making payments.

**D. After an Honorable Discharge, Mr. Adragna Was Unable to Find Employment and Needed to Support His Family.**

119. Mr. Adragna served as a combat medic in the United States Army. He ran more than 700 combat missions in Afghanistan. Mr. Adragna was awarded a Purple Heart after an IED exploded under his vehicle. Mr. Adragna was 100% disabled by his service, and has not been able to find civilian employment.

120. BAIC forced Mr. Adragna to pay off his pre-existing debts with his lump-sum payment, such that Mr. Adragna received approximately $10,000-$15,000. In return, he was expected to repay $83,897.52.

121. At no time did BAIC or any other defendant tell Mr. Adragna that the transactions into which he was entering were prohibited and void under the Federal Anti-Assignment Acts.

122. On information and belief, the effective rate of interest paid by Mr. Adragna exceeded legal limits, and up to half of the money paid by the Purchaser of Mr. Adragna's benefits never reached Mr. Adragna, but instead was appropriated by the Defendants herein. Those facts were never disclosed to Mr. Adragna.

123. Shortly after entering into this transaction, Mr. Adragna learned that this payment scheme was illegal. Mr. Adragna contacted BAIC, and informed them that he would not make his payments because this type of transaction is prohibited by law.

124. Mr. Adragna heard nothing further from BAIC until November 2017, when he

received a demand letter from Defendant Upstate. Several days later, Defendants Kern-Fuller and Upstate filed a lawsuit against Mr. Adragna in the Greenville Court of Common Pleas, on behalf of Defendant Life Funding. The third exhibit to that complaint is an assignment agreement between the Purchasers and Life Funding. *See* Exhibit J. As described more fully in Paragraph 94, *supra*, Life Funding did not exist at the time that Mr. Adragna defaulted on his contract.

**E. After an Honorable Discharge, Mr. Koepf <u>Was Unable to Work Due to His Injuries.</u>**

125. Mr. Koepf enlisted in the Army in 1996, just out of high school. Mr. Koepf was injured by an IED. After three years in military medical facilities, learning to walk and talk again, Mr. Koepf received a medical discharge. As a consequence of the radiation exposure, and the side-effects of the treatment he received, Mr. Koepf will face numerous medical problems for the rest of his life.

126. Mr. Koepf entered into a Sales Assistance Agreement with BAIC, and in the course of his transaction also dealt with Defendants Performance Arbitrage, Corbett, Upstate and Kern-Fuller. He is being sued by Defendant Life Funding.

127. At no time did BAIC or any other defendant tell Mr. Koepf that the transactions into which he was entering were prohibited and void under the Federal Anti-Assignment Acts.

128. The effective rate of interest on Mr. Koepf's loan is 35.35%. Up to half of the money paid by the Purchaser of Mr. Koepf's benefits never reached Mr. Koepf, but instead was appropriated by the Defendants herein. Those facts were never disclosed to Mr. Koepf.

129. In or about December 2015, after making approximately five payments, Mr. Koepf learned that this type of transaction is illegal, and discontinued making payments.

## COUNT I
## VIOLATION OF THE FEDERAL ANTI-ASSIGNMENT ACTS
**(By All Plaintiffs Against All Defendants)**

130. The Plaintiffs re-allege the preceding paragraphs as if set forth verbatim herein.

131. The Plaintiffs seek a declaratory judgment in accordance with 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

132. The Federal Anti-Assignment Acts proclaim that any agreement that purports to assign a veteran's pension or benefits is void from inception.

133. Perhaps in anticipation of attempts to circumvent the Federal Anti-Assignment Acts, 37 U.S.C. § 5301(a)(3)(A) specifies that "in *any* case" where a "person acquires for consideration the right to receive [a veteran's] benefit … such agreement *shall be deemed* to be an assignment and is prohibited." Emphasis added. It is the established law of this Circuit that 37 U.S.C. § 701(a) applies to—and prohibits—this type of assignment of an officer's retirement pay, and U.S.C. § 701(c)-(d) is even more restrictive.

134. The Defendants' conduct as described herein violates the Federal Anti-Assignment Acts. The agreements that the Plaintiffs are induced to sign, assigning or selling some or all of their military pensions or benefits, are prohibited and void from inception.

135. Without limiting the generality of the allegations of Paragraph 134, the invalidity of the agreements executed by Plaintiffs further means that the following provisions are void and legally unenforceable:

a. The obligation to pay a "liquidated damages" penalty equal to 100% of any unremitted funds in the event of a default or other failure to remit funds in satisfaction of the Sales Agreement;

b. The recital that any adverse decision by this (or any other Court) shall not

have collateral estoppels or res judicata effect.

**COUNT II**
**VIOLATION OF THE**
**RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT**

**(By All Plaintiffs Against Defendants Gamber, Corbett, Snyder, Plant, Woodard and Kern-Fuller)**

136. Plaintiffs re-allege the preceding paragraphs as if set forth verbatim herein.

137. Plaintiffs bring this cause of action against Defendants Gamber, Corbett, Snyder, Plant, Woodard and Kern-Fuller (the "RICO Defendants") for conspiring, agreeing, and confederating to violate, and for violating, 18 U.S.C. 1961(c), which makes it illegal for persons employed by or associated with an enterprise engaged in the activities of interstate commerce to conduct and participate, directly or indirectly, in the affairs of said enterprise through a pattern of racketeering.

138. Among other things, the Defendants acknowledge their coordinated activity as a "team" in their materials. The BAIC "New Seller Information Packet" states that:

> *The Transaction Assistance Team (i.e., BAIC, Inc., their attorneys. Vendors, and/or agents)* will withhold an amount equal to one monthly from the lump sum purchase price to ensure that that your annuity provider successfully and timely changes your payment information and keep you out of default of your sales agreement.

*See* Exhibit D, p. 12, emphasis added; *see also* Exhibit K, ¶¶ 7, 10.4, 11, 20. The SoBell "New Seller Information Packet" includes the same language. Corbett, for example, uses substantially identical forms the essentially the same language deployed by BAIC and SoBell in transactions he initiates, including authorization to release the veteran's personal information to Defendants Upstate, Performance Arbitrage, and Financial Products Distributors. Over the course of nine days, Ms. McFerren provided information and documents not just to Mark Corbett, but to

Michael Chrustawka and Kaylee Campbell[20] of Performance Arbitrage, Tina Roberson of Upstate, and David Woodard of Financial Products Distributors. In a Financial Products Distributors publication, a section entitled "Transaction Assistance Team" refers to the participation of Mark Corbett, Upstate, and "other business partners" (Performance Arbitrage is mentioned in later sections). *See* Exhibit F.

139. As noted above, the Defendants have created an elaborate artifice – using multiple corporate entities and websites – to unlawfully induce veterans to assign their pensions or benefits. Mr. Gamber controlled or controls multiple entities, such as BAIC, Voyager, and SoBell that operate in conjunction with the other RICO Defendants in furtherance of that unlawful purpose. The combination of these RICO Defendants is an enterprise as defined under 18 U.S.C. § 1961(4).

140. On information and belief, Mr. Gamber, in consultation with the other RICO Defendants, directs the overall operation of the Defendants and sets, for example, the standard terms and conditions used in connection with the transactions, the "commissions" that are paid to the "independent agents" who find Purchasers, and the misleading and deceptive disclosures made to veterans.

141. At all times relevant to this action, the RICO Defendants conspired and agreed to conduct the affairs of the enterprise and did conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).

142. At all times relevant to this action, each and every one of the RICO Defendants conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), (d).

---

[20] Ms. Campbell previously worked for BAIC, and as of February 2018 is sending emails on behalf of Life Funding.

143. Under 18 U.S.C. § 1961(1), "racketeering activity" includes any act indictable under 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud). The RICO Defendants voluntarily and intentionally devised or participated in a scheme to defraud others out of money. The RICO Defendants did so with the intent to defraud. It was reasonably foreseeable that interstate wire or mail communications would be used in furtherance of their fraudulent activities and, in fact, interstate wire and mail communications were used in furtherance of their fraudulent activities.

144. In furtherance of the conspiracy to violate 18 U.S.C. § 1962 (c), the RICO Defendants caused to be transmitted in interstate commerce materially incomplete disclosure documents and induced veterans to enter into agreements that are void and unenforceable under federal law, all in violation of the Federal Anti-Assignment Acts, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 2 (aiding and abetting wire fraud), 18 U.S.C. § 1962 (c) (RICO) and 18 U.S.C. § 1962 (d) (RICO Conspiracy).

145. The RICO Defendants have engaged in "a pattern of racketeering activity" by committing or aiding and abetting in the commission of at least two acts of racketeering activity (*i.e.*, at least wire fraud and mail fraud) within the last 10 years within the meaning of 18 U.S.C. § 1961(5).

146. The purpose of the enterprise is to enrich the RICO Defendants by inducing or defrauding veterans – often of limited means and poor credit – into entering into agreements that are unlawful and overreaching. But for their persistent scheme to violate the Federal Anti-Assignment Acts, the RICO Defendants would receive none of the lucrative commissions and profits they exact at the ultimate cost of financially desperate United States veterans.

147. The Plaintiffs have been injured in their business or property by reason of this

violation of 18 U.S.C. § 1962, in that as a direct and proximate result of the complained-of acts, the Plaintiffs have suffered damages including, but not limited to, the payment of exorbitant and unconscionable fees in connection with these legally prohibited transactions.

148. The RICO Defendants reap millions of dollars annually through this fraudulent scheme, typically at the expense of desperate veterans who face physical, psychological and financial challenges.

149. Plaintiffs seek damages, declaratory judgment and injunctive relief as appropriate.

**COUNT III**
**CIVIL CONSPIRACY**

**(Against All Defendants)**

150. The Plaintiffs re-allege the preceding paragraphs as if set forth verbatim herein.

151. The Defendants are engaged in a civil conspiracy to deprive veterans of their pensions and benefits in violation of the Federal Anti-Assignment Acts.

152. By their own admission in their various marketing documents and agreements, the Defendants have created and styled themselves as "partners" or as part of a "team." Their activities reflect the joint assent of two or more parties in furtherance of an unlawful enterprise. Mr. Gamber (and his entities), Ms. Snyder and Ms. Plant (and their entity or entities), Mr. Corbett (and his websites and DBAs), Mr. Woodard (and his entity) and Ms. Kern-Fuller (and her firm) all have conspired in an effort to exact unconscionable profits through the unlawful purchase of the Plaintiffs' pensions and benefits.

153. The primary purpose or object of the combination is to injure the Plaintiffs (and others) as they seek to avoid the application of the Federal Anti-Assignment Acts. They do this by engaging in ongoing misrepresentations concerning the nature of the underlying transactions.

154. The activities of the Defendants in furtherance of the civil conspiracy have injured

the Plaintiffs by subjecting them to unconscionable fees, charging for unnecessary and illegal quasi-life insurance, and by collecting and distributing sums from the veterans in a fashion prohibited by Federal law. In addition, the acts of the defendants in furtherance of the conspiracy caused the plaintiffs to suffer special damages, including but not limited to financial distress (including the economic losses incurred – directly and indirectly – by virtue of having to pay extortionately high, but undisclosed, rates of imputed interest), emotional distress and mental anguish. Moreover, while the Federal Anti-Assignment laws renders the agreement at issue here void from inception, there is no express provision in that law permitting veterans to recover, for example, special or punitive damages. Plaintiffs do not seek double recovery.

155. Plaintiffs seek damages, declaratory and injunctive relief as appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment against Defendants, as follows:

a. For an Order declaring that Defendants' conduct as alleged herein violates 38 U.S.C. § 5301 and 37 U.S.C. § 701;

b. For an Order permanently enjoining all the Defendants (and all persons acting in privity with them, in whatever existing or subsequent corporate form) from engaging in any further actions in violation of 38 U.S.C. § 5301 and 37 U.S.C. § 701;

c. For an Order granting each plaintiff damages in an amount equal to no less than the sums paid to the Defendants, plus pre- and post-judgment interest and fees;

d. For an Order granting each plaintiff special damages in an amount to be proven at trial;

e. For an Order granting Plaintiffs an award of reasonable attorney fees.

f. For such other injunctive and declaratory relief as the Court may deem proper.

**JURY TRIAL DEMANDED**

The Plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully submitted on this 10th day of May, 2018.

By: s/ Stephanie E. Lewis

Stephanie E. Lewis (Fed. I.D. No. 09511)
lewiss@jacksonlewis.com
John W. Sulau (Fed. I.D. No. 11613)
John.Sulau@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, South Carolina 29601
(864) 232-7000

William F. Dolan, Esq. (*Pro Hac Vice to be Submitted*)
wdolan@jonesday.com
Jones Day
77 West Wacker Drive
Chicago, Illinoi 60601-1692
(312) 269-4362

Anne Richardson, Esq. (*Pro Hac Vice to be Submitted*)
arichardson@publiccounsel.org
Adelaide Anderson, Esq. (*Pro Hac Vice to be Submitted*)
aanderson@publiccounsel.org
Public Counsel
610 South Ardmore Avenue
Los Angeles, California 90005
(213) 385-2977

*ATTORNEYS FOR PLAINTIFFS*
4824-3924-3365, v. 1